Please be seated. Good morning. We'll call our first case, number 25-1673. This is the appeal of objectors Weissman and Claypool in the Clearview AI litigation. Mr. Kirkpatrick. May it please the court. The class action settlement in this case suffers from three discrete flaws, any one of which should have precluded final approval by the district court. First, the settlement is not fair, reasonable, and adequate, as required by Rule 23E2, because it offers only the possibility of compensation of unknown value. There's no guarantee that class members are going to receive anything at all, much less adequate compensation for the surrender of their claim. Counsel, I have a question about that, because there is the cash demand option, which I understand is dependent on the settlement master acting, but your argument is contingent upon the settlement master not doing his job. Is that correct? That is not correct, Your Honor. Two things. The settlement master could make a reasonable decision not to exercise the cash demand option. If it turns out that the 17% of Clearview's revenue from the time of final approval to September 2027 is minimal, where people are only going to get de minimis relief, it might make sense, as a fiduciary, to not exercise that option in the hope that one of the three triggering events might still occur. But I will emphasize that the 17% of revenue, the problem we have there is we have no idea how much money that is. There is absolutely nothing. The settlement master has the opportunity, though, to inquire, right? I think there's some biennial reports. Absolutely, and the settlement master will get that information. The problem is the district court needed that information to judge whether 17% of revenue would be adequate compensation. There was no value forecast. There was no information in front of the district court as to what 17% will be. Will it be zero? Will it be $100 million? We have no idea, and without that information, the district court was unable to make that searching inquiry into whether the compensation is adequate. How much would you need for it to be a fair and adequate settlement, given the alternatives here? That's a difficult question. I think that compared to other data privacy class action settlements, probably it would need to be north of $50 million to even get into the ballpark of what's adequate, but of course here, we have- Each of those cases, though, depends upon a myriad of variables, right? They do. You've got some of the deepest pocket companies in the country who have agreed to some of these settlements, and here you have ... I mean, your challenge to the financial terms here is kind of striking in view of the information we have from Judge Anderson and the alternative of litigating to bankruptcy. Yes. So there is collection risk. We admit that. There is collection risk, and that is part of- That's putting it mildly. Yes. Yes, but that's part of the equation. You look at the strength and value of the claims asserted versus what the class is likely to get, you discount that strength and value for things like delay, risk of losing, collection risk, et cetera, but here we have a problem that the district court did not have adequate information on either side of the equation. We just talked about why there wasn't adequate information about the value of the 17% cash demand. There also wasn't adequate information about the value in the future of a 23% share as of September 2023, or whether there's likely to be a triggering event, but on the other side of the equation, we just don't know whether Clearview would be forced into bankruptcy by litigation costs, but even if it was, that wouldn't necessarily be a bad thing, because remember there were two aspects of this case, compensation and deterrence. Get them to stop the harmful conduct, the cease collecting information. So are you volunteering to take the case to a zero payout bankruptcy of Clearview? I'm not volunteering today to do that. I would certainly consider it, but there's more information that would be forthcoming. If this court decides to reverse the final approval and remand for further proceedings, there's a couple of ways this could go. The settling parties could go back to the negotiating table and get a better deal for the class that will pass muster. They could put before the district court an expert report. What's a better deal in your mind? A better deal would include some form of injunctive relief for the nationwide class, and a good example of that would be the settling parties point to the ACLU settlement and say, there was nothing left to be achieved here because the ACLU settlement is so good. Well, the ACLU settlement- Counsel, can you point us to cases in which such injunctive relief has been issued by any court on an unjust enrichment theory? Not in this context. What do you mean by that? Well, certainly not- What you're saying is it was unreasonable to pursue unprecedented relief, to insist on unprecedented relief as part of a settlement. Well, it's unprecedented in the class action and in the biometric data privacy context, but that's because this is new. These cases don't go to judgment often. Sure, but, well, okay. I think you've said no, thank you. Yeah, I don't have a case. What I will say, though, is if you look at the restatement on restitution and unjust enrichment, and this is chapter seven and we cited in our opening brief, it makes clear that because unjust enrichment derives from equity, you can have disgorgement of money, which is typical, but you can also have rescission, and rescission can include the return, or in this case, deletion of whatever was improperly obtained and whatever the defendant is improperly benefiting from. So, here we could get that kind of relief. Counsel, could I ask, is it your contention that Clearview is currently violating the law? Yes. How? Where? What law? The right to privacy, which is found both in tort, like misappropriation of likeness, and also... And does Clearview collect any information that is not put into the public domain voluntarily? It is in the public domain, but there are often restrictions that those platforms have which prohibit scraping. Such as? This is, I have to confess, I'm not on social media. I don't know a lot about this.  Well, here's the thing. These theories are untested, in the sense that they have not resulted in judgments, but we have seen in various cases, the TikTok settlement would be one, the two Facebook cases would be another, where not only did the class get money, but TikTok agreed to delete the biometric data. Facebook agreed to delete the biometric data. But didn't that happen as part of the ACLU settlement? Only, no, only with respect to Illinois residents. Who have the strongest claim because of the BIPA? Well, they do have the strongest claim in that sense, yes. But look at that relief. It is for Illinois residents only. Illinois residents get to opt out. That could easily have been extended to the nationwide class, and that would have provided valuable, meaningful, injunctive relief. If other states do pass laws similar to BIPA that would provide a stronger basis for a law of action against Clearview, couldn't those state AGs or residents of those states then bring a suit under those new laws against Clearview? They could for conduct going forward from the time that this settlement becomes final. But everything that Clearview did up until when this settlement becomes final, if ever, that's going to be forgiven. They're going to be able to continue to use with impunity the images and the biometric data that they already got up to that point. As to members of the class, right? Yes, as to members of the class. And yes, state AGs could bring enforcement actions. And I think that's important to emphasize that 25 state attorneys general are urging this court to reverse the final approval. And have any of them brought their own suits? Vermont brought its own suit. One? Yes. And that suit was not successful. Not on the merits, but it was dismissed first on venue and then on personal jurisdiction because Clearview didn't have the minimum contacts. But the theory behind it is that there are state common law claims. There are state constitutional claims. There are state consumer protection claims. And are any of those released that the attorneys general could bring? Well, no, because the attorneys general are not part of the class. I frankly am a little mystified by their position here. Well, they're trying to represent their citizens and saying that their citizens should not be giving up their litigation rights in exchange for what they're getting here because it is both too speculative. Well, they agree with you, but they're in a position to bring their own suits if they think there actually is a viable claim under their respective state laws, correct? They are. Okay, thank you.  The third problem with this settlement that I want to emphasize and then I want to save my time for rebuttal, but the nationwide class lacked adequate representation. I have a question about that. Are you arguing that the requirement of 23A4 was not satisfied such that the class should never have been certified? Or does your argument just go to the fairness requirement in 23E? It goes to both, but mainly no. The class could not have been certified properly. And that's because the class members outside of the four favorite subclasses had no representation. There is an intra-class allocation conflict. And the class representatives are all in the favorite subclasses. So they could not represent the people who were getting only one share. That's not a problem with certification until the proposed settlement starts differentiating among those different subclasses, right? Yes, but it does. I know, but in terms of whether original certification is possible. Well, this class was never certified. This class was certified only for settlement purposes. They never got to the class certification. They never even took a single deposition. But you're not arguing that there's an actual conflict of interest between the class members that would have existed from the outset, the way that we had in AmChem, for example. That is absolutely correct. So AmChem, in this court's decision, in Smith v. Sprint, which relies on AmChem, says when different subclasses are getting different relief, each group has to have their own class representative. No, sorry, just taking a step back. Before the question of relief and settlement, you're not arguing that they had a fundamental conflict of interest, the way, for example, in AmChem, they were people who were presently injured versus future potential injuries. That's right. Not until we saw the settlement did we realize that there was that interclass allocation conflict, because we had no allocation until we saw the settlement. Finally, just the last thing I want to say, and then reserve my time, is the class representatives had to be replaced at the 11th hour. There were eight class representatives. How does that happen? Basically, the class representatives are fired by class counsel, and new class representatives are found. And that's what happened here, because the eight original did not support the settlement and would not sign the settlement agreement. So they switched them out. And that's exactly what happened in Eubanks v. Pellowindo. And this court said, well, that's a red flag that requires heightened scrutiny by the district court, and the district court here didn't scrutinize it at all. I'd like to conserve your remaining time. Just one last question on this national class point, though. The plaintiffs point out that you aren't actually saying the payment or potential payments, the 10 to 5 to 1 ratio, is unfair. Right. We don't know. It's a strictly procedural sort of argument you're making. Is that right? That's correct. Okay. Thank you. Thank you, counsel. Mr. Thompson. May it please the court. As I think you know, I'm splitting my argument with Mr. Hansen, who will step up. Both of us are prepared to answer any questions you might have, though he, as class counsel, is going to handle most of the questions relating to the representation issue you were just talking about. I'll start in on the adequacy of the settlement, if that's okay with your honors. Interestingly, in the entirety of the objector's arguments, the standard of review was completely absent. The standard of review, as you well know, is one of abusive discretion here. Did Judge Coleman abuse her discretion in analyzing the fairness of this class action settlement and deciding that it passed muster? And for all kinds of reasons that we've laid out in the brief, she did an adequate job in this class action settlement. Did she need to look at the finances, including the specifics of this cash option? She did not ask Judge Anderson or class counsel or Clearview to tell her what Clearview's revenues were during the year leading up, which she could have then estimated forward. That information was available to her had she wanted it. That information is available to Mr. Kirkpatrick if he wants it. If his clients are represented by Mr. Hanson, he asks, he can get it. She did not ask for it because she was more interested in the potential value of the larger piece of the settlement, that is the 23% settlement stake, rather than the fallback option of the cash demand. Is that number nonetheless in the record here anywhere, the 17% valuation of the revenue number? It is not. It is not in the record. It can easily be supplied, as can the number that's been generated so far. Why don't you tell us? The number before settlement was $12.7 million in annual revenue for fiscal year 2024, which would translate at 17% to about $2.16 million. During the nine months in which revenue has been set aside account in 2025 with quarterly reports given to Judge Shanker, the settlement master, that number is about $15.7 million, so that $2.6 million have already been set aside over those nine months. One of the reasons the court gave for thinking the settlement, both the 23% stake and the settlement, the cash demand, would have value is because she and Judge Anderson recognized that with the overhang of this litigation, Clearview's business was being hindered. Clearview had a likelihood of improving its fortunes once the overhang of a class action, an existential threat via class action was lifted, Clearview would have a chance of succeeding and that its revenue numbers so far reflect that. Mr. Thompson, is it correct that you all started putting that money, that 17% aside, when the district court approved the settlement? District court judge approved the settlement on March 20, 2025. We started putting 17% aside in a segregated account on March 20, 2025. Okay. I read the settlement document's definitions of final a little differently, but you're committed to that as being the correct . . . When this issue was raised post-settlement, we all went back to the terms of the settlement agreement and said, you could make an argument either way, we have to read it in the most conservative way, which is start setting it aside right now. Okay. And you agree that's the way to read it? I agree that's the way to read it. Thank you. Counsel, you mentioned quarterly reports to the settlement master.  I didn't essentially see that in the agreement, but . . . It's not, but that's what we've been doing. Okay. And he's entitled to get that information, we've just . . . In working with Judge Shanker and deciding how he would like to get the information, that's what he and Clearview and the class have settled upon and the way he'd like to receive it. I mean, if he wanted it monthly, we could do it. If he wanted to wait a year, we could do that, too. He's asked for it quarterly, so that's what we've done. In the objector's briefs, there's often an effort to blend the analysis of unjust enrichment with the analysis of what they call constitutional and other state law claims. To be clear, the only claim ever asserted in this case on behalf of the nationwide class was an unjust enrichment count. So when you're analyzing, should the class action have included injunctive relief on behalf of the nationwide class, that can only have been on the one claim they brought, which was for unjust enrichment. I'm not sure . . . Go ahead. How much are we supposed to, or must we or may we, consider these unasserted but released claims in evaluating the overall fairness of the settlement? Because you're right, they're not in the complaint, but they are released in the settlement. So it is part of the value that Clearview got for settling. And I think you can value them both that way. The standards I understand for questioning a release that's part of a settlement go into was the overall settlement fair. So Judge Coleman said the only analysis I can do for, the only basis I have for granting injunctive relief are the claims that have been asserted in front of me. So she could not have granted injunctive relief on anything other than the unjust enrichment count. She could have, and I believe did, because her report talks about the release arguments that were raised below her and that she considered, is the release overly broad because it releases claims in addition to those that were broad. And she considered that, said it did not change her opinion as to the fairness, and as this court recognized in Williams v. G. E. Otto, it's commonplace in class action settlements. They always say, I want to say always, nothing is done always, they typically say releasing all claims based on the same underlying conduct, whether those claims were asserted in this case or not. This settlement tracks that same release language that is commonplace in class action settlements. And that's all we have here. Is there anything that you want to offer on this issue about the representation of the nationwide class? I know we'll hear about that from Mr. Hanson. Mr. Hanson will address that. Judge Hamilton, you asked a very pertinent question, which is, has anybody ever, anywhere, granted injunctive relief on an unjust enrichment claim? They've not shown us any and I've not seen any. All they can offer is class action settlements that survive motions to dismiss, that include unjust enrichment claims. Or, in one case, Judge Shader finding a default judgment, saying every one of the counts succeeds, including a trademark claim, including a computer fraud claim, including an unjust enrichment claim, in which he says, for unjust enrichment, they've asked for disgorgement of ill-gotten gains, which is the typical unjust enrichment relief. And for injunctive relief, he says, I'm going to give it because irreparable harm is assumed in a trademark case. This is a trademark case. There's no indication whatsoever that he was granting injunctive relief on an unjust enrichment count in that default judgment setting. Thank you, Mr. Thompson. Let me leave the rest for Mr. Hanson. Mr. Hanson. Good morning, Your Honors, and may it please the Court. I'm going to start with following on some questions that were asked of Mr. Kirkpatrick, and that is, the adequacy of representation argument is premised on a fallacy. That there was not a named plaintiff who was a member of the nationwide class. To the contrary, throughout this litigation, at the time the complaint was filed, at the time the motion for preliminary approval was filed, at the time the settlement was negotiated, and the motion for final approval, the named plaintiffs were always members of the nationwide class. That really doesn't solve the problem, though. And I understand that, because... It's a helpful clarification, but could you address the underlying central problem here? Yeah, and the reality is, Your Honor, is that when we negotiated this settlement, and we've discussed at length the process that that went through, with Judge Anderson's capable assistance, to arrive at a somewhat unique structure. So we have a settlement fund. We now need to figure out how to allocate that settlement fund. And we could have done it a number of different ways. We considered, and frankly, it's based on the strength of the claims, is how we came up with the 10-5-1 structure. I totally get that. I'm trying to figure out... As far as I can tell, though, what you're asking us to approve here is unprecedented in class action law. Where you don't have anybody getting the short end of the stick among the members of the nationwide class who has said, yeah, I'm a representative, I have a fiduciary duty to the other class members, and I think this is... I'm convinced that this is a fair allocation. And I understand Your Honor's point, but I do believe that there's a... It's a little bit of a semantical argument that the other side has made. Because we could have drafted the settlement agreement so that the named class members were in the nationwide class. We could have said that everybody gets one chair. And then if you are a member of another state... Can you... I mean, that's a little bit... All the class members would still have gotten more, though. All the named claims would still have gotten more by virtue of their membership in one of the other classes. Do you think we can resolve this issue in your favor in a manner that's consistent with the Second Circuit's decision in Literary Works? Or would it necessarily create a circuit split with that case? No, I think absolutely you can. And in fact, I believe the Literary Works case, which was cited by appellates and ours in our briefs, that case talks about how, even if there is differing payments among class members, that is not necessarily a fatal issue with respect to adjudicating the fairness and reasonableness of a settlement. Because what you go back to, and I think in stark contrast to Literary Works and every other case they've cited, is there... all those other cases, there were glaring issues of unfairness that were patent in the case. And that's really what the district court is charged with doing. I don't know that you're getting our problem here. And the problem is not that this is an unreasonable structure. Obviously there are differences in state laws. There will be cases where such differentiation makes sense. But I'm still having trouble seeing how structurally, procedurally, it can be deemed fair to approve a settlement where the folks getting the short end of the stick are not represented with respect to that allocation issue. And I do understand that, that that's your concern, Your Honor. And I think, again, the way that the courts have addressed that, and it's not just Literary Works, but Judge Posner in the Reynolds case, also cited by the appellants in their brief, all talked about that lack of representation amongst a particular class is not a fatal defect. Sorry, who says it's not a fatal defect? Both the Reynolds case and the Literary Works case, Your Honor. Okay. And the way that you determine whether it's a fatal defect is the way that you determine anything with respect to a class action settlement, is you have the district court judge take into account all of those arguments and determine, based on her discretion, whether the settlement is nonetheless fair and reasonable. And I understand that Your Honor is not focused on whether the settlement is fair and reasonable or whether Judge Coleman did her job. But the point is that the cases that the appellant has cited 201 have all massive problems with fairness with respect to the unrepresented subclass. And in this case, those problems don't exist. At all. Well, I mean, depending on your evaluation of the strength of the different state laws. And Judge Coleman's. Of course. Absolutely. And frankly, even the appellate's. Let's look at two paths. What does an opinion look like that says, this is okay? It would certainly be unprecedented. Again, I don't necessarily agree with that statement, Your Honor. What does it look like? I believe it says that the appellants have raised an issue of there being an unrepresented class. The district court properly evaluated this concern, exercised her discretion, and we have no basis for overturning her determination that despite that unrepresented subclass that the settlement is fair, reasonable, and adequate. And suppose we're not persuaded by that and we say this has to go back for, in essence, reconsideration with adequate representation of the nationwide class getting the short end of the stick. What happens then? What does that look like? I think it would almost certainly be putting form over substance, Your Honor. I understand your criticism of that, but how do you fix it? I think that there would be a member of the nationwide class who would be identified, I suppose to make sure that all those concerns were addressed, that person or people would have separate representation and the exact same settlement agreement would be entered into. That's very possible. Tell us, how did it happen that the subclass were replaced? Who does that and with what approvals? This is getting a bit into the weeds of how this case evolved, Your Honor. It's an extraordinary set of facts. It is, and I'm not going to try and suggest otherwise. However, it is certainly not a Eubanks situation where all the class plaintiffs quit and a new one was appointed who was the father-in-law of the counsel who was about to be suspended for practice of law. That's an outlier case and we explained in our brief why. The lead class counsel in this case in the district court was always my firm, Loewe & Loewe. It was led by a particular attorney. That attorney left the firm. The lawyers then had an adjudication in front of Judge Coleman as to whether the lawyer who left or the firm, Loewe & Loewe, was lead class counsel. Judge Coleman decided it was Loewe & Loewe. We continued in that role. We did not have, because the former lawyer took all of his clients with him, we did not have an actual client in the case. Now, all the other lawyers who were involved were still class counsel, but we were lead. We discussed, as we negotiated the settlement, we discussed it with our co-counsel. We kept them apprised. We asked for comments on the settlement agreement. We got some comments on the settlement agreement from them and made changes based on those comments. And then it came time to have the settlement agreement executed and we were informed why all the lawyers of the named plaintiffs, they are not going to sign. Thank you, counsel. I have one final question. I read somewhere that there were over a thousand opt-outs. That's correct. Has there been any analysis of those opt-outs, i.e., are they more the non-four states, not the subclasses, but nationwide class members? I don't have that information for you. I do know that the only thing that I do know is that of those opt-outs, three of them were formerly named plaintiffs. The other four formerly named plaintiffs did not opt-out. So we don't know if those opt-outs could be all nationwide class members, except for those three. To my semantic point, they all are nationwide class members. I understand. Only nationwide class members. I don't know the answer to that. Thank you. Mr. Kirkpatrick, you have... We'll give you two minutes. Thank you, Your Honor. What matters is what is the value of the claims released, not the claims asserted. So the point that was made by my friend on the other side about Judge Coleman was not asked to impose injunctive relief on anything other than unjust enrichment for the nationwide class. That's not the point. What the district court needs to do is assess the value of what is being released, not asserted. And what we see from you all is the assertion that there are these sort of asteroid cloud of state constitutional and statutory and common law claims all over the place, and nobody has been that there's real value that's being released. Well, we believe those claims are colorable. And this court in Murphy v. Fleet Mortgage said that colorable claims have to be assessed. They were not assessed here. And 25 state attorneys general say that they're viable claims. I understand. We don't have a judgment to show you where this has happened before. This is a novel case. And it's a novel settlement. And that's why we need to examine it. And here, if I can just go back to the standard of review, this court reviews for abuse of discretion. But that's layered on top of what the district court is required to do, which is act as a fiduciary of the absent class members and give heightened scrutiny to the settlement. And that's what didn't happen here. And so that is an abuse of discretion because the district court didn't have the information necessary. She didn't have any of that information we heard about what's in the 17 percent revenue, you know, account. She didn't have any of that forecast. She didn't have any of the information about these other released but non-asserted claims. And that's why we think that it was an abuse of discretion. And this court should remand for further proceedings. Thank you, counsel. Your time is up. Thank you. The case is taken under advisement.